# IN THE COURT OF APPEALS OF IOWA

No. 17-0194
Filed March 22, 2017

**IN THE INTEREST OF X.M.,**
**Minor Child,**

**D.M., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, David F.

Staudt, Judge.


        A mother appeals the termination of her parental rights to her one-year-old

son.  **AFFIRMED.**


        Anthea T. Galbraith of Iowa Legal Aid, Waterloo, for appellant mother.

        Thomas J. Miller, Attorney General, and Mary K. Wickman, Assistant

Attorney General, for appellee State.

        Timothy M. Baldwin of Juvenile Public Defender's Office, Waterloo,

guardian ad litem for minor child.


        Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

X.M. started his life as a Safe Haven baby.[1]  His mother, Destiny, told medical personnel after giving birth in September 2015 that she planned to leave the hospital without him.  The juvenile court approved an emergency removal.  The next day, Destiny reasserted her rights but told the Iowa Department of Human Services (DHS) she wanted to place her son in temporary foster care.  Three months later, in December 2015, the DHS placed X.M. with Destiny's parents, where he has lived throughout the child-in-need-of-assistance (CINA) case.

On January 20, 2017, the juvenile court terminated Destiny's parental rights under Iowa Code section 232.116(1)(e) and (h) (2016).[2]  She appeals that ruling, arguing the State did not offer clear and convincing evidence to support the statutory grounds for termination and the juvenile court failed to explore other permanency options under section 232.104.  After an independent review of the record, we are convinced the termination order is correct.[3]

We start with Destiny's challenge to the statutory grounds.  The juvenile court cited two subsections under section 232.116(1) supporting termination of Destiny's parental rights.  We may affirm on either one of those grounds if it is

---

[1] Under Iowa's Newborn Safe Haven Act, a parent may voluntarily release custody of the newborn infant by relinquishing physical custody at a hospital, without expressing an intent to again assume physical custody.  *See* Iowa Code § 232.1, .2 (2015).

[2] The juvenile court also terminated the parental rights of X.M.'s father, who does not appeal.

[3] Our review of termination-of-parental-rights proceedings is de novo.  *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).  We are not bound by the factual findings of the juvenile court, but we give them weight.  *See id.*  Proof must be clear and convincing.  *Id.* Evidence is "clear and convincing" when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence."  *Id.* (alteration in original) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

supported by clear and convincing evidence. *See D.W.*, 791 N.W.2d at 707. After reviewing the record, we conclude termination was proper under section 232.116(1)(e).

To terminate parental rights under section 232.116(1)(e), the State must show: (1) the child has been adjudicated CINA under section 232.96, (2) the child has been removed from the physical custody of the parent for at least six consecutive months, and (3) there is clear and convincing evidence the parent has not maintained significant and meaningful contact with the child during the previous six consecutive months and has made no reasonable efforts to resume care of the child despite being given the opportunity to do so. "Significant and meaningful contact" means taking on the "duties encompassed by the role of being a parent." Iowa Code § 232.116(1)(e)(3). Those duties include financial support, continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, and a genuine effort to maintain communication with the child. *Id.* Overall, a parent must "establish and maintain a place of importance in the child's life." *Id.*

Destiny does not dispute the first two elements of subsection (e) but concentrates on the third element, claiming she has maintained significant and meaningful contact with X.M. since his birth and has maintained a place of importance in his life. The record belies her claim. Since X.M.'s birth, Destiny has vacillated between wanting to give him up and wanting to act as his mother. Destiny has another son, who was seventeen months old when X.M. was born in September 2015. At the hospital, Destiny told the DHS worker that she "didn't think she could take care of two children at this time."

In April 2016, Destiny had a change of heart and started participating in visitation with X.M. The mother-son interactions went well, and the DHS increased the length and frequency of the visits in May 2016. But in the summer of 2016, Destiny moved to Des Moines and stopped participating in DHS services. Destiny did not appear for a June 2016 review hearing and reportedly had told her mother that she no longer wished to be a parent to X.M. According to a report filed in October 2016 by the Court Appointed Special Advocate (CASA), Destiny visited her parents about twice a month and incidentally saw X.M. during those trips. The CASA recommended termination of Destiny's parental rights and adoption by the maternal grandparents.

In November 2016, the State filed a petition to terminate parental rights. Destiny did not appear for the December 2016 termination hearing; her attorney was present but despite "numerous attempts" had not been able to contact Destiny. Destiny's mother reported her daughter said she could not attend court because she couldn't "afford to get off of work." The maternal grandmother also told the court she "really [didn't] know" if Destiny was consenting to termination of her parental rights, but in the grandmother's opinion, Destiny did not want to assume care of X.M. The juvenile court heard no witnesses but admitted several exhibits offered by the State. X.M.'s guardian ad litem believed termination was appropriate because "both parents have sort of distanced themselves from actually parenting him over the life of this case."

The juvenile court aptly summarized the situation:

> Destiny has voluntarily given up custody of her child. She has agreed to her parents as placements. She has not visited the child in any significant or meaningful way but for weekends in which

she happened to be visiting her parents. She has performed no affirmative duty toward parenting. She has not provided financially for [X.M.] She has no continued interest in the child. She has made no genuine effort to complete the responsibilities prescribed in the case permanency plan. She has made no genuine effort to maintain communication with the child and has no intent of having the child reside with her in Des Moines.

On this record, it is clear Destiny did not maintain significant and meaningful contact with X.M. from June 2016 through December 2016 and made no reasonable efforts to assume care of X.M., despite being given the chance to do so. *See In re T.S.*, 868 N.W.2d 425, 436–38 (Iowa Ct. App. 2015).

We turn next to Destiny's argument concerning "her desire for her parents to be awarded guardianship of X.M. if he is not returned to her care." On appeal, she charges that the juvenile court "failed to explore this option." The trouble is that Destiny did not appear at the termination hearing to present this option to the juvenile court, and she did not communicate her desire concerning a guardianship to her attorney. Because it is raised for the first time on appeal, we are unable to address this issue. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) (applying error-preservation rules to termination of parental rights cases).

Destiny also cites Iowa Code section 232.116(3)(a), which permits the court to forgo termination if the child is in the legal custody of a relative. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). The juvenile court decided X.M.'s "custody by his grandparents is not [a] substantial enough reason not to terminate Destiny's parental rights." The court found Destiny had no intent to raise X.M. We agree it would be inappropriate to apply this permissive factor given Destiny's indifference to maintaining a relationship with X.M.

**AFFIRMED.**